JAMES B. GANTT, Contestant, v. JOHN C. BROWN; HENRY C. TIMMONDS, Contestant, v. JOHN KENNISH; HOWARD A. GASS, Contestant, v. WILLIAM P. EVANS.

In Banc, December 20, 1911.

1. **ORIGINAL PROCEEDINGS: Commissioner to Take Evidence: Rulings on Evidence: Interlocutory Decision.** As a rule of practice, where a commissioner has been appointed to take evidence in an original proceeding brought in the Supreme Court, the court will not consider his certification of rulings on interlocutory matters arising during the hearing, but will wait until he makes his final report thereon. Where he rules that certain evidence offered is not competent, and other evidence is competent, the court will not, upon his certification for a ruling as to the competency of said evidence, decide the case by piecemeal by giving a decision on the points for his guidance in the further taking of testimony, but will leave him free to rule according to his own judicial judgment, and will reserve its decision on the points until the cause is finally submitted. But the court will consider his application far enough to clarify and elucidate the original order given him where it has been misconceived by him and counsel—for instance, where the bare order without explanation is broader than some of the previous decisions of this court.

2. **ELECTION CONTEST: Poll Books and Ballots as Evidence: Prima Facie Case of Fraud.** It is not necessary that the party charging fraud or illegality in an election must show a prima facie case of fraud before he can have the poll books and ballots as one step towards proving the fraud charged. Wherever there is an allegation of fraud in an election contest, made in good faith, the ballots and poll books should be opened for the purpose of showing fraud, whether it is actual fraud or what may he denominated legal fraud. [Overruling State ex rel. v. Spencer, 164 Mo. 1. c. 33; Montgomery v. Dormer, 181 Mo. 5.]

  *Held*, by VALLIANT, C. J., that this court has never decided that the secrecy which the Constitution requires can be invoked to cover up or protect a ballot that has been cast by a man who had no lawful right to vote, and hence the Spencer and Dormer cases should not be overruled.

  *Held*, also, that the court should decide now whether certain persons whose names are on the registration books, which fail to show that such persons had been naturalized or the

court wherein naturalized, were legal voters, and whether or not the testimony of the voter is sufficient to contradict his ballot.

3. ———: Fraud: Competency of Evidence: Testimony of How Witness Voted: Secrecy of Ballot. The provision of the Constitution in reference to a secret ballot was not designed to be a bulwark behind which fraud could lurk and propagate Where fraud in the election is alleged in good faith in the election contest, the mode and measure of proof should be as broad as the charges, and any available evidence tending to establish or disprove the charge is competent. Not only are the ballots and poll books competent, but a witness may testify as to how he voted, as tending to show fraud or no fraud. But whether the unsupported testimony of the witness will set aside the face of the ballot, if it contradicts the ballot, is not decided, but, in the present status of the case, is reserved.

4. ———: Comparing Ballot with Poll Book. When the ballot is examined and shows a certain number, the party challenging it as fraudulent is entitled to the poll book to show by the corresponding number thereon who cast it. The statute (Sec. 5911, R. S. 1909) so provides, and the Constitution does not inhibit. [Overruling State ex rel. v. Spencer, 164 Mo. 1. c. 23.]

5. ———: Comparison with Registration Book and Other Documents. Where fraud is alleged in good faith in the election contest case, the registration books and other papers and documents required by law to be made and preserved in those counties where registration of voters is required, are available, along with the poll books and ballots, to establish or disprove the fraud. [Per WOODSON, J., with whom a majority concur.]

*William C. Marshall* and *W. M. Williams* for contestants.

*Selden P. Spencer* and *Lon O. Hocker* for contestees.

GRAVES, J.—These cases are now before us upon the following request filed herein by the commissioner appointed by this court:

"Your commissioner, Robulus E. Culver, heretofore appointed by your Honorable Court, would respectfully show to the court that he proceeded with

the taking of testimony in the above entitled causes as directed by the court's order herein; that during the progress of the taking of said testimony the contestants asked for a subpoena *duces tecum* directed to the Board of Election Commissioners of the city of St. Louis, Missouri, commanding said board to produce the poll books of the election held in the city of St. Louis on November 8, 1910, for the offices in contest, and other State offices, and offered said poll books in evidence for the purpose of showing the numbers set opposite the names of the persons whose right to vote at said election was challenged by said contestants for the reasons assigned and set out in the report of the proceedings had before your commissioner; that thereupon your commissioner ruled that under the evidence so far introduced said poll books were inadmissible, because immaterial and irrelevant to any issue made by the pleadings or the evidence already taken, except as to certain of the voting numbers appearing on said poll books; that all of the facts in relation to said request and ruling appear in the testimony taken and proceedings already had, which are fully set out and have been by your commissioner filed with the clerk of this Honorable Court; that thereupon both the contestants and contestees objected and excepted to the ruling of your commissioner on said matters, and joined in a request that said ruling be certified to your Honorable Court.

"Wherefore your commissioner prays for instruction and direction as to the correctness of his rulings in the respect aforesaid."

There are two questions sought to be propounded to this court in this request. The contestants' counsel thus state them in their brief:

"The commissioner has asked directions from the court upon two propositions that have arisen during the progress of the hearing before him:

"The first arises upon the application of the contestants for a subpoena *duces tecum* for the poll books, in order that they may procure the voting number of persons registered as aliens who do not affirmatively appear by the registration books to be qualified voters.

"The second question submitted by the commissioner is the right to the poll books to show the voting numbers of electors who have testified that they voted a straight Democratic ticket and did not scratch Judge Gantt, and who have consented in the record to have their ballots examined."

Counsel for contestees, thus state the questions which they desire answered by this court:

"(a) Whether or not the failure of clerks of election to properly enter on the registration books all the facts called for by the blanks of the registration books is in itself evidence sufficient to discredit the vote of the person whose registration is not thus complete on the book, or, in other words, does the mere failure by election clerks to enter upon the registration books either the information required by the statute or called for by the blanks on the registration books prima facie disqualify from voting the man concerning whom such failure is made, so that his vote is presumptively a vote not to be counted?

"(b) Is the statement made today by a man who says that he voted in November, 1910, and voted a certain ticket in a certain way, sufficient evidence to warrant the production of that ballot (the voter not objecting) and the ascertainment of what that ballot shows on its face to the end that if the ballot appears differently from the testimony of the man, his testimony (nothing else appearing) may contradict the ballot and the ballot may be counted not as written. but as the witness testifies he cast it last November, or, in other words, is the statement of a voter, made several months after the election, sufficient to change

his vote as it appears on its face, there being no other evidence to show that the vote had been changed or altered except the testimony of the witness as to the kind of vote that he cast last November?''

These questions arise from this state of facts. Contestants proceeded to take evidence tending to show that the registration books of the city of St. Louis showed a number of persons of foreign birth had been left thereon as legal voters, but said books failed to show the fact that such person had been naturalized or the court wherein naturalized. Upon this showing contestants asked for a subpoena *duces tecum* for the poll books, so as to get the name of the voter and compare it with the ballot, to the end of showing an illegal ballot. This request the commissioner refused, and contestants ask a ruling upon that question. Later contestants put on certain individuals who testified that they had not scratched the name of James B. Gantt from the Democratic ticket, and the contestants evidently being of the opinion that the ballots showed such name scratched, asked for the poll books as to such names, to the end that the voting number might be shown and the name of the voter might be shown, and this when compared with the ballot would tend to show that the ballots had been changed after leaving the voter's hands. This request was granted by our commissioner and a subpoena *duces tecum* ordered, and upon this question the contestees desire a ruling.

This presents the matter sufficiently for what we shall have to say.

I. But for one reason we would recertify these questions to the commissioner for him to answer upon his own responsibility without an opinion from us. That reason we will disclose in the succeeding paragraphs. Cases should not be heard and determined by fractions or in piecemeal. The exact question was

up in State ex inf. v. Standard Oil Co., 194 Mo. l. c. 165, and we then said:

"Certainly it is not the practice in this State for a referee to be required to report intermediate matters to the court appointing him for instruction from the court, nor is it the usual practice for a master in chancery, from time to time, to refer matters to the court appointing him so that he may be controlled in his rulings on evidence or other matters within the warrant of his authority. All these things are settled, by and large, upon his final report. If it then appears that he has erred in the admission of evidence, that evidence is excluded. If he has excluded proper evidence, the case may be sent back to him to hear and consider such evidence. If a witness decline to answer on the ground that his answer would incriminate him and is committed by the commissioner on the theory that the question is not privileged because the statute had granted immunity, or for other reasons, we see no reason why a witness should not take the same chance a defendant does when he stands on a demurrer to a petition and finds when too late, maybe, on appeal, that the petition was good and the judgment final and impregnable. At least, we are not willing to sanction any innovation by inaugurating the practice of applying here for instructions to a commissioner. He should be left free and uninfluenced by us to exercise in the first instance his judicial judgment. Nor does the importance of the case, or the fact that distinguished counsel are employed, or the gravity of the questions raised, demand that we should respond to anomalous requests. If we make such rule in this case, then, by the same token, it must be the rule of practice in every submission to a special commissioner on an original proceeding instituted here, and we will be compelled to consider certifications on interlocutory matters, however humble the case, however obscure the

counsel employed, or however simple the matter involved.

"The matters certified to us are, therefore, recertified to our special commissioner that he may proceed therewith and with all matters pertinent to this hearing under the broad and flexible power given him by his order of appointment."

That case was before the Court in Banc as then constituted, and the above doctrine enunciated by LAMM, J., was concurred in by BRACE, C. J., GANTT, VALLIANT and MARSHALL, JJ. The other members of the court, BURGESS and FOX, JJ., concurred in the result, and as there were other questions in the case it is left in doubt as to whether or not they endorsed all that was then said upon the question of practice. But be that as it may, that case settled the practice in this court, and we think wisely settled it. Nor do we in this case intend to depart from that rule. We shall not now undertake to specifically answer the questions propounded, but leave those matters to our commissioner after we have cleared the atmosphere in regard to the order entered when the commissioner was appointed.

II. We take it that our order has been misconceived by both the commissioner and the counsel in the case. A reading of the order to recount the ballots as made by this court will show that it is broader than some of the previous opinions of the court. The commissioner and counsel upon both sides seem to be proceeding upon the theory that what they term a prima facie case of fraud must be shown before the party charging fraud or illegality in an election, can have the poll books and ballots as one step toward proving the fraud charged. This view of the law is erroneous. By broadening our order as stated above we intended to indicate, both to the commissioner and the counsel engaged, that the rigid ruling of some pre-

Gantt v. Brown.

vious cases from this court was not longer to be followed, but we now see that we then made a mistake in not going further and specifically stating our reasons for thus broadening the order aforesaid. Those reasons will so enlighten the commissioner that there will be no further necessity to make inquiry of the court as to the competency of evidence, or as to the force and effect of evidence already taken or about to be taken.

In this case the contestants charge fraud in the election—both actual fraud and what might be denominated legal fraud. The classification is immaterial, in cases of the character under consideration, because fraud is fraud, whether it be actual or legal. In other words, a person in good faith and without intention to work a fraud upon any person might cast a vote, and yet the vote would be illegal. Such a vote in law works a fraud upon the person against whom it is cast, and would be denominated a legal fraud. Another person knowing himself to be disqualified might vote and such a vote would be tainted with both actual and legal fraud. A vote as cast might be changed by actual fraud. But where fraud is charged in good faith in the petition it can make no difference in a case such as is here whether the fraud be actual or whether it be what might be denominated legal fraud.

We hold that where there is an allegation of fraud, made in good faith, as appears to be from the pleadings in the cases at bar, the ballots and poll books should be open for the purpose of showing fraud. The stability of our government is dependent upon the honesty and purity of the ballot. The secrecy of the ballots had better be scattered to the four winds rather than have such secrecy shield corruption in elections. The framers of our Constitution in providing for a secret ballot never dreamed that they were erecting a bulwark behind which fraud could lurk and propagate, and eventually run rampant throughout the land. Bet-

ter a thousand times that the individual's vote should be spread upon canvas under calcium light, than that fraud should be locked up within the lids of official ballot boxes and poll books, with no known legal method of exposing such frauds.

We hold further that when charges of fraud are made as above indicated the mode and measure of proof should be as broad as the charges. The best evidence should be available in the search for fraud, or in disproving the charges of fraud. This best evidence is ofttimes locked up in the ballot boxes and the poll lists or books. When bona-fide charges of fraud are made it should be the policy of the law to unlock all competent evidence to either prove or disprove the charges. With this as the rule a determination of whether or not certain proof makes such a prima facie showing of fraud as to authorize the production of poll books or ballots, becomes unnecessary. This being our idea as to what the rule of law is, we decline to now say whether the irregularities in the registration lists show fraud or do not show fraud. That is one of the matters for consideration when these cases are ultimately passed upon by the court. In other words, our views of the law make it unnecessary to pass upon the question at this time, and leaves it to be passed upon at the proper time in the course of the proceedings, i. e., when the case is finally submitted to us for decision. The parties must judge of the sufficiency of their proof before finally submitting their cases. If the means of proving fraud should be as broad as the charges, there is no question but that a witness can testify as to how he voted, as tending to show fraud or no fraud, but whether the unsupported testimony of the witness will set aside the face of the ballot, if it show to the contrary, is a question to be determined when the case is before us for decision, and not at this time. These views dispose of the matter before us, but inasmuch as we are of opin-

ion that these views are not entirely in harmony with some previous rulings of this court, and that the trouble with our commissioner has grown out of such previous rulings, we deem it proper at this time to discuss our case law, in so far as it applies to the question before us.

In State ex rel. v. Spencer, 164 l. c. 33 it is said: "The pivotal question involved is whether the circuit court had power to order the election commissioners and the parties litigant to make a comparison of the ballots with the voting lists, and to require the election commissioners to return and certify to the court 'all the facts which either of the parties to the aforesaid election contest may desire and request to have returned, and which may appear from the said ballots and the examination and comparison thereof.' "

The above fairly states the question discussed in that case. The answer to that question by the same opinion is couched in this language: "So that up to this time the Legislature has only given the parties or their attorneys the right to fully examine the ballots and to require the clerk to certify all the facts which either of the parties may desire which appear from the ballots. No right has been given them to compare the ballots with the voting lists. Such a comparison would disclose how the elector voted, and thereby lift the veil of secrecy, without his consent, to the parties and their attorneys, and they would be under no obligation not to disclose the information so obtained, for their oath of secrecy is limited by the statute 'not to disclose any fact discovered from such ballots'—not from such a comparison."

To this doctrine we do not now and never have subscribed. The vice of the answer then given by this court lies in the language, "No right has been given them to compare the ballots with the voting lists." Such a rule renders nugatory the constitutional provision for contests in election cases. A contest pro-

ceeding is but an empty shell if all avenues of proof are closed, as is done by this rule. To illustrate: A brings contest proceedings against B. A charges that John Jones cast an illegal ballot. It then becomes necessary for A to prove that Jones voted for B. An examination of the ballot does not show it. Say that Jones's voting number was 25. The ballot would show the voting number and show that whoever cast that vote had voted for B, but it would not show that Jones had cast it. To complete the proof it is necessary to compare the number upon the ballot with the number 25 upon the voting list and if opposite that number upon the voting list is the name of John Jones, then the proof is made and not before then. But this the Spencer case says cannot be done. If not, contests in elections might as well be denied *in toto*, because they become at once but howling farces. Fraud of the grossest character may be charged, and may in fact exist, yet by this opinion it is hermetically sealed within the lids of the ballot boxes and the poll books. The fact as to how Jones voted cannot be shown by the ballot alone, nor by the poll books alone. It requires the two, and without the two before the court in some form, there can be no real proof.

Following the lead of the Spencer Case, we in Montgomery v. Dormer, 181 Mo. 5, reiterated the rule that there could be no comparison of the ballot with the poll books so as to identify and connect the voter with the ballot alleged to be fraududent, but announced that it could be shown by the judges of the election as to how the challenged voters had cast their votes. In other words in the Montgomery Case, the trial court under the ruling in the Spencer Case, supra, had been driven to the necessity of hearing the judges of election give their best recollection of how thirteen voters had voted upon a certain office, and we said the circuit court was right, because the best evidence was locked up and could not be used. To the latter doc-

trine we do not assent, and this case like its prede-
cessor is wrong. If the judges of election remembered
just how a voter had voted, it might be proper for him
to testify, because the Constitution relieves him of
his oath of office, in the event of a trial where his evi-
dence becomes necessary, but in the Montgomery Case
we went further and said:

"The court had no authority to order the clerk
to open the ballots and ascertain how these thirteen
men had voted and report the same to the court, neither
did the court have authority to require the clerk to
bring the ballots into court for inspection and ex-
posure."

There again is re-announced the rule which in
effect renders contests of elections as provided for in
the Constitution nugatory. What judge of an elec-
tion can remember how the individual voter voted upon
any given question? What trial judge would believe
a man who would undertake to testify to any great
number of votes in this way? But above all what good
reason can be assigned for shutting out the only real
evidence and compelling trial courts to listen to mere
secondary evidence? These two cases upon the point
now under review are hereby overruled, and the same
ruling applies to some later cases which have in a way
undertaken to follow these two pioneer cases. Our
reasons we assign in the next paragraph.

III. Whilst our Constitution and laws provide
for the secrecy of the ballot they do not contemplate
that this secrecy shall prevent the full and complete
investigation of alleged fraud before the proper forum
when fraud is in good faith charged. Section 3 of arti-
cle 8 of the Constitution reads: "All elections by the
people shall be by ballot; every ballot voted shall be
numbered in the order in which it shall be received,
and the number recorded by the election officers on the
list of voters, opposite the name of the voter who pre-

sents the ballot. The election officers shall be sworn or affirmed not to disclose how any voter shall have voted, unless required to do so as witnesses in a judicial proceeding: Provided, That in all cases of contested elections the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as may be presented by law.''

By this section the bar of secrecy is raised by express terms when required in judicial proceedings. By it the election officers are required to keep secret the vote of the voter, but only to such time as he may be required to expose it in the course of a judicial proceeding. When required in a judicial proceeding to tell how a voter has voted such officer must disclose to the public ear the secret of the ballot. We say to the public ear, because courts of justice are public forums, and take no part in star-chamber proceedings. If the election officer must disclose the contents of the ballot, as he must under this constitutional provision, what then becomes of the secret ballot, so much discussed in the Spencer case? With its contents exposed by the terms of the Constitution we have but the faded paper securely locked in the ballot box by the Spencer and Montgomery cases, supra. The secrecy of the voter is gone. When the Constitution has been obeyed and the election officer has said that John Jones voted for B at a given election, this secrecy of that ballot that far is public property, and should be public property. But it is urged that there is no right to compare the ballot with the poll book and thus connect the voter with the alleged fraudulent ballot. It is conceded that the commissioner can examine the ballots and certify the result of that examination to the court, but we must not have the poll books in evidence, so that we can determine whether a certain individual voted a given ballot. There is one section of statutory law not fully considered in either the Spen-

cer or Montgomery cases supra. Such section throws much light upon the alleged sacredness of these poll books.

Section 5911, Revised Statutes 1909, reads: "At the close of each election, the judges shall transmit one of the poll books, by one of their clerks, to the clerk of the county court in the county in which the election was held, within two days thereafter; if the poll books are not returned in the time provided, the clerk shall have the power to either send the sheriff or a messenger for said books; the other poll book shall be retained in the possession of the judges of the election, open to the inspection of all persons."

This section at least applies to the divers counties of the State. By it two poll books are required to be kept. One is a counterpart of the other. They show the same facts. Now note the language: "The other poll book shall be retained in the possession of the judges of the election, *open to the inspection of all persons.*" What becomes of the alleged sacredness of these poll books? What legislative intent does this statute disclose? Does it mean that were there a contest in Cole county the information gained from an open examination of this poll book would be unavailing in such contest case? Does it mean that if in the trial of such case it is made to appear that ballot number 25 was cast for B, A could not compel the production of this open public record, and show that ballot number 25 was cast by John Jones, and then follow that proof by showing that John Jones had never been naturalized? We think not. When it is shown that ballot number 25 was cast in favor of B, the very statute which makes one of these poll books open for public inspection raises the much discussed "veil of secrecy," because any person present at the hearing can examine this public document and see that such ballot was cast by John Jones. This statute is clearly expressive of a legislative intent contrary to

closing the avenues of evidence in the trial of question of fraud. But this is not the only statute declaratory of such legislative intent.

Going now to the laws particularly applicable to the city of St. Louis, we find section 6228, Revised Statutes 1909, which reads:

"The judges shall fold in two folds and string closely upon a string or wire all ballots counted by them except those marked 'defective,' or 'rejected,' unite the ends of such string or wire in a firm knot, enclose the ballot so strung in an envelope, on which shall be endorsed, in writing or print, the number of the precinct, date on which such election was held, and securely seal such envelope, so that it cannot be opened without breaking the seal, and return said ballots, together with the package containing the ballots marked 'defective' or 'objected' or 'rejected,' in such sealed package or envelope to the election commissioners. Two of said judges of opposite politics shall, immediately after signing the statement of the result of the canvass and tally sheets and the sealing of the ballot box, go together to the office of the election commissioners and deliver said ballot box and the key thereto to said election commissioners, who shall keep the office open until all of said ballot boxes have been received. Immediately upon receiving said ballot boxes said commissioners shall give a receipt therefor to said judges and shall place them properly arranged in the order of precinct numbers in boxes which shall be securely locked. Said boxes shall be placed in a vault having a double lock, and said vault shall be locked and keys retained by commissioners of opposite political parties. *Said election commissioners shall securely keep said ballot boxes for twelve months, not opening or inspecting them nor allowing any one else to do so, except upon order of court in case of contested election, or when it shall be necessary to produce them at the trial of any offense committed under*

*this article.* At the end of twelve months after said election, said ballots shall be destroyed: *Provided,* that if any contest of the election of any officer voted for at such election, or prosecution under this article shall be pending at the expiration of said time, the said ballots shall not be destroyed until such contest or prosecution be finally determined.''

By the preceding section the poll books are required to be put into the ballot boxes. Under section 6228, supra, the commissioners are to securely keep such ballot boxes (contents, ballots and poll books). They are not to inspect them (meaning the contents, not the mere naked boxes) nor permit anybody to inspect them, ''except upon order of court in case of contested elections,'' etc. In such excepted cases what are to be inspected? Most certainly the contents of those boxes, and this includes both ballots and poll books. Not only so but the commissioners in other cases are to securely keep them for twelve months, or until such time ''when it shall be necessary to produce them (not the naked boxes, but the contents, the ballots and poll books) at the trial of any offense committed under this article.'' Now where do these ballots and poll books go? To a plain ordinary court of justice. For what purpose do they go? That they may be used in evidence on the trial of a cause. Not only so, but by the last clause of the section these ballots and poll books must be kept intact even after the expiration of twelve months providing a contest or prosecution is pending. Kept for what? Certainly not in seclusion and for no purpose as held in the Spencer case and cases following its trend.

But even this is not all. Section 5939, Revised Statutes 1909, reads:

''Either house of the General Assembly, or both houses in joint session, or any court before which any contested election may be pending or the clerk of any such court in vacation, may issue a writ to the clerk

of the county court of the county in which the contested election was held, commanding him to open, count, compare with the list of voters and examine the ballots in his office, which were cast at the election in contest, and to certify the result of such count, comparison and examination, so far as the same relates to the office in contest, to the body or court from which the writ is issued.''

This section has long been on the books and is discussed in the Spencer case. That discussion, however, does not meet with our views. In that case the return to be made by the officials under the order of the court must be confined to what is shown by the ballots themselves, and not a return showing the result of an examination of the ballots, and the comparison of those ballots with the poll books. The plain reading of the statute is emasculated by the Spencer and Montgomery cases. The statute commands the clerk (1) to open, count and compare the ballots with the list of voters and examine the ballots, and (2) ''to certify the result of such count, comparison and examination, so far as the same relates to the office in contest, to the body or court from which the writ is issued.'' Now, what result shall the clerk certify? The result of an examination of the ballots only, as said in the Spencer case? We say no. The statute speaks for itself. The statute says ''the result of such count, *comparison* and examination.''

The Spencer case and those following it eliminated from the statute the result of the comparison of the ballots with the poll lists, and in this thwarted the clear legislative intent as expressed by the statute.

Going further we find still another section which throws light upon the question. Section 5905, Revised Statutes 1909, in so far as applicable to the point in hand is concerned reads:

''And the ballots, after being counted, shall be sealed up in a package and delivered to the clerk of

the county court or corresponding officer in any city not within a county, who shall deposit them in his office, where they shall be safely preserved for twelve months; and the said officer shall not allow the same to be inspected, unless in case of contested elections, or the same become necessary to be used in evidence, and then only on the order of the proper court, or a judge thereof in vacation, under such restrictions for their safe-keeping and return as the court or judge making the same may deem necessary; and at the end of twelve months, said officer shall publicly destroy the same by burning, without inspection.''

This section goes to the ballots themselves. It is a part of the general election laws. Section 5911, discussed supra, left one of the poll books open for public inspection. Both sections are in the same article. In the quoted portion of section 5905, supra, note the language, ''or the same become necessary to be used in evidence.'' Used in evidence how? ''Under such restrictions for their safe-keeping and return as the court or judge making the same may deem necessary.''

If this section does not disclose a legislative intent to the effect that the ballots themselves can be used in evidence in proper cases, I have misconceived what I take to be unequivocal language. In truth and fact this section contemplates that the ballots upon the order of the court may be taken from the legal custodian and used in evidence. At least it does contemplate that the legal custodian can be called upon to produce them for use in evidence before the court. Of course the court must arrange for the safe-keeping and return of these ballots after they have been used in evidence, but that this is a clear provision for their being used in evidence there can be no doubt.

In determining the legislative intent the whole body of the law must be considered, and not selected portions thereof.. We have, therefore, taken up some

sections not discussed in the Spencer case. An examination of this body of laws as applied to the State at large and as applied to the city of St. Louis convinces us that the Legislature never intended to deprive a contestant of his right to show fraud by the best evidence, and never intended to hermetically seal the evidence of fraud in the ballot boxes and poll books, as is done by the Spencer and Montgomery cases, supra, and perhaps in a more modified form in some succeeding cases.

We have no doubt that if it becomes necessary in the progress of these cases for this court to inspect certain of the ballots, we would be acting within the Constitution and statutes to send for them, or direct our commissioner, under proper restrictions, to procure for us the needed information.

We shall not go further. Upon the questions discussed herein the Spencer and Montgomery cases, supra, and those following them, are overruled. The charges of fraud are thereby rendered susceptible of proof, if fraud in fact exists, and the question of a prima facie showing of fraud is out of present consideration. This permits the case to be tried as other cases, as a whole, leaving the parties litigant to decide for themselves whether or not the evidence introduced thus far proves fraud. That question we will determine when the case is submitted for our decision.

With these observations upon the law of the cases the questions propounded by our commissioner are recertified to him for determination. *Ferriss, J.,* concurs; *Lamm* and *Woodson, JJ.,* concur in separate opinions by them filed, in which said separate opinions all concur; *Valliant, C. J.,* dissents in an opinion filed by him; *Kennish* and *Brown, JJ.,* not sitting.

## CONCURRING OPINION.

LAMM, J.—I concur in all either said or decided in the principal opinion, and add a few observations, *dum fervet opus.* The cases overruled were by no means intended to make a sanctuary for fraud, but, as pointed out by my brother GRAVES, they resulted that way. By lifting high the secrecy of the ballot and putting it on a pinnacle as the very be-all and end-all of the law, by so interpreting the law that secrecy became the central and controlling thought in our election laws, the vital matter of the chastity and integrity of the ballot was lowered away and made of mere secondary moment. As if, withal, it was more precious to a free citizen to have for whom he voted kept secret than to have his vote counted at all or counted as cast. It is a wise precept of the law everywhere allowed as true that *the greatest incitement to guilt is the hope of sinning with impunity.* That precept it seems to me was ignored in the cases overruled. To do just and right is the chief commandment of the law. That great commandment was laid out of view it seems to me in those cases. When this court adopted the new view that fraud could worm itself into and find a sanctuary in the ballot box, that the ballot box could be nailed up with its possible abominable secret of fraud safely hid away in its bowels, we thereby unintentionally put a barrier not to be overleaped in the way of proving fraud in election contests. Whereby the law, which abhors fraud, which delights to follow it relentlessly high and low and snatch away its fruits from its doers, which thereunto permits a wide and minute search for it, which is fond of declaring that fraud vitiates everything polluted by its dirty hands, supinely permitted itself to stand baffled, helpless, puzzle-headed and paralyzed before fraud in the ballot box. *Messieurs,* the assassins of the ballot, might well smile when they awoke to that view of it. Not only so, but

to protect the mere secrecy of the ballot an anomalous and dangerous ingenuity of device sprang up. For example, in State ex rel. v. Hough, 193 Mo. l. c. 632-3, we approved an order in a contested election case requiring the election commissioners of St. Louis to *exclude not only the parties to the contest and their attorneys, but all other persons from their office, while comparing the numbers appearing on the ballot with the numbers appearing on the poll books, etc.* What was that but prescribing a secret inquisition strange to the laws of a self-governing people? What was that but a vital step *in the dark* taken in a law suit in disobedience to the constitutional mandate that courts of justice should be open? In counties outside of St. Louis, with no election commissioners, it became the practice under that construction of the law to make an order in election contests allowing the county clerk to make such comparisons and compile *data* in secret, away from the eye of witnesses, the court or opposing counsel, and his certification of the result of this secret inquest was allowed deep significance by the trial judge. As if enormous temptations did not dog the footsteps of secret power! As if the trial judge could trust the county clerk with the secrets of the ballot and could not trust himself or the attorneys, officers of his court! In one notable case, Hale v. Simpson, 198 Mo. 134, the records in our files will show that the county clerk in his certificate of facts, so secretly got at in the dark, entirely reversed the returns of one precinct, thereby electing his political friend by a majority of two votes. Now, this same county clerk had subscribed $50 to a fund to pay attorneys and costs to aid that very contest. He had retained counsel and the new doctrine permitted him to act as judge in the same case and so act alone, in secret, unchecked by any human eye or agency. It is indeed difficult to use the calm and venerable language of jurisprudence in dealing with a situation of that sort.

When we made the original order in the instant case permitting attorneys to be present when the election commissioners were making their comparisons and preparing their data for the certificate made by them in this case we practically overruled State ex rel. v. Hough, supra, in that particular. By now overruling State ex rel. v. Spencer, 164 Mo. 23, in the matter discussed by my learned brother GRAVES, and overruling all cases following it, we put the investigation of fraud in an election case precisely on the foot of any other investigation of fraud so far as we can. Our ruling does not mean that the secrecy of the ballot should be exposed except in so far as it may be absolutely necessary, under the allegation of the pleadings in an election contest, to show fraud, if any, and to that extent neither the Constitution nor the statutes protects the secrecy of the ballot. In such ruling we but return to the practice in vogue for many years before State ex rel. v. Spencer engrafted an unsound and anxious innovation on the law. The opinion of our brother opens the door to a full search for fraud and that is right. It leaves contestants to carry the burden of the charges of fraud they make in their petitions, and that is right, too. It leaves to us to see whether when the proof is all in, the justice of the case is with contestants or contestees and such result is also right. *Ferriss, Woodson,* and *Graves, JJ.,* concur; *Kennish* and *Brown, JJ.,* not sitting.

## CONCURRING OPINION.

WOODSON, J.—I fully concur in all that is said by my learned associate, Judge GRAVES, in these cases.

And in addition thereto, I desire to say, in my opinion, his observations apply equally as well to the registration books and all other papers and documents required by law to be made and preserved in those counties and cities where the electors are required to

register before voting; and for that reason, I think his opinion should embrace those books and papers.

All concur except *Valliant, C. J.,* who dissents, and *Brown* and *Kennish, JJ.,* who did not sit.

## DISSENTING OPINION.

VALLIANT, C. J.—This court has never decided that the secrecy of the ballot, which the Constitution requires, can be invoked to cover up or protect a ballot that has been cast by a man who had no lawful right to vote.

The decision in the case of State ex rel. v. Spencer, 164 Mo. 23, does not so decide, although it has been so interpreted. What was said in the opinion in that case must be understood as referring to the facts in that case. There the contestant had challenged in his petition the legality of practically all the ballots cast in the city at that election and had filed as an exhibit to his petition as a list of illegal voters a copy of the poll books with only a few names erased. So sweeping was his charge of illegality against the whole voting population of the city that he included even his own name. The order of the circuit court was as broad as the contestant's demand; it ordered the board of election commissioners "to proceed to open, examine, count and compare with the list of voters in your office all the ballots that were cast at the general election aforesaid for the office of coroner for the term above mentioned." The result of that examination was to be certified to the court and become a public record and thereby make public how every man in the city voted, whether he was a legal or illegal voter. This court decided that that was an unwarranted order. If it is thought we ought to overrule that case, then in my opinion we ought to wait doing so until a case comes to us involving the same principle.

In the majority opinion it is said: "The framers of our Constitution in providing for a secret ballot never dreamed that they were erecting a bulwark behind which fraud could lurk and propagate, and eventually run rampant through the land." I concur in that as a proper construction of our Constitution on that point, but if that is intended as announcing a doctrine contrary to the former decisions of this court on that subject it is in my opinion founded on a misconception of what those decisions are and an oversight of what this court has expressly said on that subject. In Montgomery v. Dormer, 181 Mo. 5, the evidence showed that thirteen persons who were non-residents had voted and the judges of election having testified for whom the ballots of those persons were cast, the question was as to the legality of that testimony; on that point this court said: "Our Constitution and statutes (Sec. 3, art. 8, Constitution; Sec. 6995, R. S. 1899) expressly forbid election officers 'to disclose how any voter shall have voted.' But the voter there referred to is one who has voted when he had a right to vote, and not one who has voted in violation of the law. There is nothing in our law designed to guard the secrecy of a ballot that has been cast by one who had no right to vote. The law has no protection for a dishonest or illegal voter. Therefore, when it is first shown to the satisfaction of the court that a man has voted when he had no right to do so, it may be shown for whom he voted and his vote will be withdrawn from the candidate to whom it was given." That is the last utterance of this court on that subject and there is nothing in the reports to the contrary.

In the cases at bar the counsel on both sides have presented to the court an agreed statement of facts showing that certain persons voted at the November, 1910, election concerning whom certain facts appear in the evidence already taken. Counsel agreeing as to the facts, disagree as to the law applicable; counsel

for the contestants contending that those facts show that those persons were not legal voters, and therefore the contestants have a right to go to the poll books to get the voting numbers of those persons and then go to the ballots to see for whom they were cast. Counsel for contestees contend that those facts do not show that those persons were not legal voters and hence the contestants have no right to know for whom they voted.

In my opinion it is the duty of this court to consider those points of contention now, and if the court should decide that the facts so shown impeach the legality of the voter it should make an appropriate order to ascertain for whom his ballot was cast, and if the court should decide that the facts so shown do not impeach the legality of the voter, then it should say so and refuse to make the order and that would end the contests. The court is as prepared now as it will ever be to decide whether the facts shown in evidence by the contestants is sufficient to impeach the validity of the ballots challenged, and no good can result to either party by delaying.