## HOWARD A. GASS, Contestant, v. WILLIAM P. EVANS.

### In Banc, June 26, 1912.

1. **ELECTION CONTEST: Jurisdiction: Challenged By Intermeddler.** A county clerk, commanded by the court's writ to recount the ballots in his county, in aid of an election contest for a State office, to which he is not a party, cannot, by motion, challenge the jurisdiction of the court, for he is an intermeddler, and his motion without legitimate function.

2. ————: **In Supreme Court: Jurisdiction.** The Supreme Court has jurisdiction to hear and determine an election contest for the office of State Superintendent of Schools, brought by the unsuccessful candidate at the election, as contestant, against the candidate who received the certificate of election and the commission to take office, as contestee. [Following Gantt v. Brown, *ante*, 271.]

3. ————: **Motion to Dismiss: Impliedly Overruled or Abandoned.** A motion to dismiss the election contest, filed early in the proceeding, charging that the allegations of contestant's petition are too general, are merely fishing in character and only aimed at making a discovery, and that the action has not been prosecuted with due diligence, was impliedly and in effect overruled by subsequent orders, sometimes made on showings and sometimes on stipulation of counsel, extending the time of the commissioners to take evidence, and will be considered as abandoned by the movent's silence on the final hearing at which it is not contended the petition does not state a cause of action.

4. ————: **Registration Number.** All the ballots cast at a general election in the city of St. Louis will not be thrown out because of an absence from each of the ballots of the registration number thereof, although to throw them out would result in giving

the office to the contestant. The ballots were not illegal because the registration number of each was not placed thereon. [Following Timmonds v. Kennish, *ante*, 318.]

5.  ———: Fraud: Secrecy of Ballot. The secrecy of the ballot. should be kept inviolate up to the point where it becomes necessary to show fraud in the ballot box or ballots, and no further. There is no place where fraud can take sanctuary from justice. But the proof of fraud must be kept within the averments of the petition.

6.  ———: ———: Irregularities. Irregularities in detail are bound to occur in all registrations and elections where little time is allowed and a vast array of voters register or vote and a multiform aggregation of minute details are necessarily crowded into that little time. Courts recognize that condition as a natural one in election contests, and work out the wrong and right of the matter and the injury to the contestant or contestee by weighing the facts and giving heed to the letter and not losing sight of the spirit of the laws.

7.  ———: ———: Not Established. Where the averments of contestant's petition relating to fraud are established neither by the recount of the ballots by the board of election commissioners of the city, nor by the recount of the county clerks of the ballots cast in their counties, nor by the report and findings of the court's commissioner appointed to take evidence in the election contest case, nor by the other testimony, the issue of fraud will be put aside. Fraud is not to be grounded on suspicions or conjectures.

8.  ———: Illegal Voters: Negroes: Names Stricken at Subsequent Registration. The fact that at a registration in January after the election in November the names of eleven hundred negroes who had voted in November were stricken from the registration books, as unknown and not found, along with the names of fifteen thousand men, white and black, is not sufficient to establish the contention that those eleven hundred negroes were illegal voters; especially, where it is shown that the registration for said November election was taken in September and at said November election a question was voted upon which was of all-pervading interest. The vote of a voter is not impugned by the mere fact that his name is stricken from a precinct registration list on a recanvass two months. after an election.

9.  ———: ———: ———: ———: Presumption. The presumption is that a name placed upon the registration books. by the judges and clerks of election is properly there, and that when he has voted and his vote has been counted he was a legal voter.

10. ———: ———: ———: ———: From Disreputable Houses. The fact that negro voters registered from disreputable houses in a congested negro quarter of the city, or from lodging, rooming or boarding houses, in numbers ranging from one to nineteen from each of said houses, does not of itself tend to show that they were not legal voters. Technical or actual sexual immorality is not a statutory disqualification to vote; and the court will take judicial notice that imperious prevailing social conditions irresistibly drive negroes to herd together.

11. ———: ———: Unnaturalized Citizens: Equal Number for Each. Where the number of persons voting for contestee who contestant claims were not naturalized citizens is counterbalanced by an equal number of persons voting for contestant who were by the same token not naturalized, the court will not determine whether any of them were or were not naturalized citizens at the time they voted.

12. ———: ———: Sporadic Scratching: By a Single Mark. The striking off of contestant's name with a single stroke of the pencil, sporadically, in all precincts of the city, if there is no evidence pointing to a motive or to a common and preconceived design to commit the wrong of unauthorized erasure, will not be held to constitute illegality in the election, especially if such sporadic scratching affects both candidates alike. The court cannot know judicially that a legal voter, wishing to scratch a name, would use more than a single stroke of his pencil.

13. ———: ———: Registration: Neglect or Mistake of Clerk: No Entry Under Qualified Voter. If the entries under proper headings in the registration books show the voter to be a legal voter, and he is permitted to vote, the fact that the registration clerk wrote the word "no" under the caption "Qualified Voter", in the registry, when he should have written "yes," or that he wrote nothing at all under that heading, will not justify the court in holding the ballot of such a voter to be illegal. Such act of the clerk would neither enfranchise an illegal voter nor disfranchise a legal one. The duty of the contestant in such case is to go further and show that the man who voted and opposite whose name on the registration book under the words "Qualified Voter" was written "no," or nothing at all, was in fact an illegal voter.

Held, by WOODSON, J., that the statute requires the Board of Election Commissioners to state on the registration books what persons whose names appear thereon are "qualified voters," and said statute is mandatory, and the judges of election cannot change that determination by the board once made.

14. ———: ———: **One Initial on Ballot.** The statutes do not themselves declare that a ballot on which the initials of only one judge of an election appears is not to be counted; and unless there is such a statute, the court in an election contest will look into the matter to determine whether or not actual fraud caused the omission of the initials of the other judge. But if the legal voter himself does no wrong, performs his own duty and casts an honest ballot, it should be counted, in the absence of a statute declaring it cannot be counted. [Overruling McKay v. Minner, 154 Mo. 609; and following Hehl v. Guion, 155 Mo. 76, and Bowers v. Smith, 111 Mo. 45.]

## Election Contest.

JUDGMENT FOR CONTESTEE.

*W. C. Marshall* and *W. M. Williams* for contestant.

*Spencer & Donnell* and *Lon O. Hocker* for contestee.

For briefs, see under Gantt v. Brown, *ante, p.* 271.

LAMM, J.—At the general election in November, 1910, Howard A. Gass was the Democratic and William P. Evans the Republican candidate for the State office of Superintendent of Public Schools. On the face of the returns, Mr. Evans was elected. On his receiving the certificate of election and the commission to take office for four years, Mr. Gass filed his petition to contest his election in this court on December 17, 1910, after giving due notice. On that day Mr. Evans appeared and filed his answer. At sundry times from that day to this, motions (to be presently disposed of) were filed, directed to one or another phase of the case. At a certain time our writ issued to the board of election commissioners of the city of St. Louis, commanding them to fix a day (within thirty) and proceed to open the ballots cast in said city at said election, in the presence of con-

testant, contestee and their counsel (after taking a prescribed oath) and count and compare the ballots with the lists of voters, examine them and certify the result here. That board obeyed that writ and their return of the recount increased Mr. Evans's lead slightly. On January 11, 1911, Romulus E. Culver, Esq., of the St. Joseph bar, was appointed our commissioner to take testimony and report his finding in the instant case, as well as in companion cases pending contesting the same election between other parties (James B. Gantt v. John C. Brown, and Henry C. Timmonds v. John Kennish) on other offices. He qualified, took upon himself and well performed the duties prescribed by our order. Thereafter, taking a vast volume of testimony, spread on 7160 pages in ten volumes of typewritten manuscript, he returned the same into this court, with his findings of fact and report, on the 15th day of May, 1912—the cases being· treated by all hands as if consolidated. That report will be recurred to presently.

Thereupon contestant excepted to that report. Set down for a special hearing on June 17, 1912, the consolidated case on its merits and on motions was· submitted for final disposition—five judges sitting (VALLIANT, C. J., LAMM, WOODSON, GRAVES and FERRISS, JJ.)

The facts warranting it, we take space and leave to say (and say it *con amore*) that we are beholden to distinguished counsel for the benefit of oral arguments and briefs unexceptionable in matter and taste. To hear and decide, not to praise, is the office of the judge. Peradventure, however, to commend counsel for putting away temptation to take on color and heat, when such temptation dogs the heels of cases of a political character, is to speak to a judicial purpose. The case bespoke, and received, a fine courage, to be tempered (as it was) with serenity and equipoise at the bar. So, it bespeaks it from a bench whose quick-

ening precepts should be: Ye shall not respect per-
sons in judgment; but ye shall hear the small as well
as the great; ye shall not be afraid of the face of man.
(Deut. i.17) And that noble saying of Virgil in the
Aeneid, I remember to have been once used by our
brother WOODSON: "Trojan and Tyrian shall be
treated by me with no discrimination." (*Tros
Tyriusque,* etc.)

Because briefs take a wide play, it will head to-
wards brevity to treat propositions in our own order
and way.

I. *Of a bundle of motions.*

(a). Early in the litigation Mr. Seibel, county
clerk of St. Louis county (commanded by our writ
to recount the ballots in that county) filed a motion
peremptorily challenging our jurisdiction; and on that
and other grounds asking us to vacate or modify our
order to him. Up to this moment that motion, slum-
bering, has been passed in silence by court and coun-
sel. As to that we say: As Mr. Seibel is not a party
nor does he appear by invitation or leave granted as
"a friend of the court," he is an out-and-out in-
termeddler and has no *locus standi* to intervene. Be-
cause of that fact, according to correct form, his mo-
tion is without legitimate function. So, in the evolu-
tion of the case, we have long since gone on beyond
some of the points to which movent directs his mo-
tion. [*Vide,* Gantt v. Brown, 238 Mo. 560.] It is of
little avail to do so vain and inutile a thing as to tread
back in our tracks to dispose of moot questions. As
to other points, they are raised by those entitled to
raise them and deserve and have received attention.

The motion is stricken from the files to be con-
signed to the dustheap.

(b). Early in the litigation counsel for contes-
tee moved to have certain legal questions, raised by
the pleadings, set down for oral argument. That mo-

tion was passed *sub silentio*. As to that motion we say: Such of those questions as survived the wear and tear of the flux of time and run of events in the case have now been argued on final submission. Hence that motion has no office but to go also to the dustheap.

It is stricken from the files.

(c). On February 25, 1911, contestee filed a motion to dismiss, grounded on the theory that this court was without original jurisdiction to hear and determine any election contest. As to that we say: That identical contention, carried forward as live matter in pleadings and briefs, was submitted in this and in the two companion cases, and has been ruled adversely to contestee, on full consideration of its constitutional bearings, in an opinion by GRAVES, J., in one of those companion cases, Gantt v. Brown, handed down at this delivery. We stand by our deliverance in that case. *Stare decisis.*

The motion is overruled.

(d). On July 12, 1911, contestee filed a motion in nature ancillary to the other, to dismiss. It was grounded on the notion that the allegations of contestant's petition are too general, are merely fishing in character and only aimed at making a discovery, and because the action has not been prosecuted with due diligence—all to the wrong and injury of contestee, who complains he is serving in office without pay and is subject to the drain of expenditures of a grave character in the employment of counsel, etc. As to that we say: The orders of this court from time to time, sometimes by stipulation of counsel and again on showing made, whereby our commissioner's time was extended, were either of right or of grace. In either event, they practically overruled that motion to some of its intents and purposes. What was thus done in fact, but impliedly, as we went along, may

as well be done in form at the end. As to the assault on the petition in the nature of a general demurrer (we say "demurrer" because that is the most favorable construction to put upon it) it is not now contended in briefs that it states no cause of action. Such silence should be taken as tantamount to abandonment. Hence the life has gone out of the point. We have no call to be astute to set up barriers in the road to the merits of the case.

The motion is overruled.

With this clearing away of some propositions, ruled in companion cases, and the underbrush of subsidiary matter, main propositions remaining come into the clear.

II.  *Of two other propositions to be put out of the case.*

(a). Here, as in companion cases, it is alleged in the petition (and now argued in contestant's brief) that each and every of the 143414 ballots cast at the election in the city of St. Louis in November, 1910, should be discarded in the count. This, because of an alleged vice common to all, to-wit, the absence of a registration number on the back of every ballot voted in that great city—a condition originating seventeen years gone and existing ever since in every election held there. It was based on a construction of complex and overlapping statutes involving separate schemes of registration and voting in country districts and in cities differently classified by population (not without some obscurity and consequent difficulty in interpretation) hitherto universally acquiesced in by all political parties and candidates. If the contention be sound, then Mr. Gass is entitled to the office of Superintendent of Public Schools; for it stands admitted that all St. Louis ballots were in that fix, and on such hypothesis Mr. Evans falls many thousand votes short of enough to elect him. If it be unsound, then it

is out of the case and other questions remain to be considered. As to that we say: In Timmonds v. Kennish, supra, contestant stood on that lone proposition and put it to the touch to win or lose all. So that contestant's bread if any loaf there was to be, was due to be baked in that one oven in that case, or not at all. The proposition was declared unsound on full deliberation on a review and interpretation of pertinent statutes, in an opinion by FERRISS, J., handed down at this delivery in that case. To such situation Coke's maxim applies: Of like things, in like cases, the judgment is to be the same. (*De similibus*, etc.) Accordingly, as we ruled there, so we rule here.

The point is disallowed to contestant.

(b). After making in his petition a formidable aggregation of twenty or more averments amounting to fraud in the registration, in the appointment of election officers, in a false count, in the manipulation of ballots, in intimidation by an unlawful use of process, some of them covering the acts of voters, some the acts of registration officers, some the acts of judges and clerks in and about the performance of their duties at the polls in receiving and counting ballots, some to the scratching of ballots, some in the selection of judges and clerks, who (it is alleged) masqueraded as belonging to the Democratic party when they did not—all contrary to the law and to the right of the matter—contestant went on to allege, in effect, that Mr. Evans was the beneficiary of the fruits of such frauds, and that when the apparent result was purged of fraud it would be found that contestant was elected. "Wherefore," to quote the last clause of his petition, "contestant prays leave to produce his proof of the facts and charges aforesaid."

It would be useless to encumber this opinion with a more detailed statement of the specifications of fraud and gross irregularities amounting to fraud set

244 Mo. Sup.—22

forth in the petition. The aforesaid general summing up will do. Contestee joined issue on those averments by his answer.

(As our purpose is to deal with those averments in a block, we allow ourselves a foreword, viz.: there is a contention made in briefs relating to negro votes cast at the November election of 1910, and to votes of aliens, which will receive separate attention. Hence what we have to say under this head does not appertain to those votes.)

Midway in the history of this case the question how to get at the proof of such of those averments as pertain to fraud in the ballot box and ballots, was considered by this court, with a view to instructing our commissioner how to proceed and how litigants might proceed in proving or disproving allegations of fraud in that regard. What we had to say in that behalf is said in our opinion on interlocutory questions certified here by our commissioner in the consolidated case, Gantt v. Brown, 238 Mo. 560. In that case it was ruled, in effect, that (*ex debito justiciae*) the secrecy of the ballot should be kept inviolate up to the point where it became necessary to show the fact of fraud in the ballot box or ballots and no further; that fraud being hateful to the law there was no place in Missouri where it could take sanctuary from justice. Our judgment in that behalf was of such character that technical barriers, supposed to exist in the way, were burned away in the pursuit of fraud in an election case, always, of course, keeping the proof within the averments of the petition; that the accepted rules of law relating to the investigation of fraud in other cases were of such obstinate significance as to hold fast in an election contest case. Those rulings amounted to holding that, in conformity to his prayer, contestant was granted ''leave to produce his proof of the facts and charges aforesaid.'' The door was opened wide to him (and he was invited) to go on and

produce all his proofs. He did go on at will to the day finally fixed by us for the end—one that gave him ample time for the taking of proof and ran for a year or so.

Attending to the result of that long and searching investigation, we make these observations:

We have no call to go out of our way to pass encomiums on the fairness of that election, as one side seems to want us to do, nor to go out of our way to stigmatize that election as unfair, as the other side seems to want us to do. Irregularities in detail are bound to occur in all registrations and elections where little time is allowed and a vast array of voters vote or register and a multiform aggregation of minute details are necessarily crowded into that little time. Courts recognize that condition as a natural one in election contests, and work out the right and wrong of the matter and the injury to one or another litigant by weighing the facts and at the same time giving heed to the letter and not losing sight of the spirit of the laws. Such irregularities were found as of course in the registration and election in question. Whether they were more or less than in other elections held in St. Louis we have no data here to compare and decide, therefore we have no judicial call or right to comdemn or approve by way of comparison. Nor are there any data here by which it can be determined that Mr. Gass suffered more by them than Mr. Evans. (*Nihil habet forum ex scena.*)

We content ourselves with ruling on the record before us. Attending to that, the very heart, the sum of the matter is this: Neither by the recount of the board of election commissioners of St. Louis certified here, nor by that certified here by the county clerk of St. Louis county, nor by the testimony, nor by the report and findings of our own commissioner, are the averments of contestant's petition relating to fraud, and his consequent damage therefrom, estab-

lished. Indeed, we are no little inclined to put that construction on the concessions of counsel in oral argument. As apposite to the whole situation, we may borrow a venerable figure gravely used in sober discourse. It is said of Lord SHAFTESBURY's short career as Lord Chancellor that it was like March—it came in like a lion and went out like a lamb—his discourse flew so high in a certain particular at the start and became so mild at the end. [*Vide,* Fonblanque's Eq., Laussat's Ed., p. 40, *note.*] So here of the phrase of the petition relating to fraud and injury therefrom, as compared with the facts uncovered. True, *suspicions* are indulged in briefs. But we know of no accredited Treatise on Suspicions, up to this time, whereby metes and bounds may be put to them, or (what is closer home) whereby a judge may discern their office in a lawsuit, if any, or the rules for applying them, if any. Indeed, suspicion is but smoke, conjecture. As the dream of a sleeper fades at daybreak, so conjecture and suspicion fade in the sunlight of the facts in a litigated case.

The sensible and sufficient rules to go by are: What does not appear from admission or proof is taken by the judge as non-existent. In fraud he who alleges in court holds the burden of proof. Fraud or dole is not to be presumed. Honesty and good faith are persumed, absent proof to the contrary. So that it matters not that fraud will be followed relentlessly and its fruits snatched away by courts with a willing and ungloved hand. It must first be found to exist before it bears any fruit to be snatched away.

Giving heed to those precepts (and the premises all considered) this cause can not be determined in favor of contestant on the theory he was defrauded out of his election, as alleged in his petition.

Accordingly we so hold, and put fraud, as such, to one side.

III.  *Of negro votes.*

Contestant maintains that the rise of 1100 negro votes were improperly cast and counted for Mr. Evans. Before disposing of that contention presently, a preliminary observation is due. Thus, by discarding those votes in certain hypotheses put by counsel in their brief and then by going on and taking from Mr. Evans's vote, thus reduced, a certain number of other votes, the election of Mr. Gass, by a small plurality, is calculated. But in none of those hypotheses could Mr. Gass be declared elected unless those 1100 negro votes are first taken bodily from Mr. Evans's count. It becomes apparent, then, that the key to the situation on contestant's own theory is those negro votes. If they were properly allowed to Mr. Evans then all contestant's hypotheses fail him. If they are to be discarded, then that fact does not elect Mr. Gass, unless other contentions obtruded are also ruled in his favor.

Recurring to those votes, the contention is not new in this court. *Contra,* it was made and pressed before our learned commissioner. We stress the fact that it was disposed of by him, after summing up the testimony pro and con, as follows: "My finding from all this testimony is that it falls short of showing that any of these colored voters did not in fact exist, or did not reside at the places from which they registered."

But exception is taken to that finding and the significance of the matter warrants this court in going deeper into the facts. In doing so it may be assumed that in the registration of September, 1910, preparatory to the general election, negro voters (either real or simulated) representing those votes, registered, passed the subsequent verification, canvasses and scrutiny and voted for Mr. Evans in November, 1910. In the January following that election there was pending a "charter election" in the city of

St. Louis to be held the last day of that month. There was also pending a regular city election to be held in the ensuing April. So much clearly appears from the testimony, and that, as shown by the record, was the theory of counsel before our commissioner. It is not quite clear under which recanvass of voters preparatory to those two elections those 1100 negro voters. were stricken off the registry books, but it was at one or the other, and my reading of the testimony inclines me to believe it was done in January preparatory to the charter election to be held January 31, 1911. The statutory scheme for registration, canvass of votes, verification therefor, sifting and purging the lists, and for holding elections in the city of St. Louis (R. S. 1909, sec. 6221), contemplates an additional registration, verification and a recanvass purging the lists before every city election proper and before every election for the ratification of a revised city charter held between the all-round, new registrations required once in four years for presidential elections. Whatever was done in the way of a recanvass, additional registration, verification and the striking off of names of voters was done under that section; and what actually was done at that time was to strike off some fifteen thousand names (white and black) from the registry books, including said 1100 negro voters.

No vital significance is attached by contestant's counsel to striking off any of those fifteen thousand names, except negroes. We face, then, this proposition: Over 1100 negroes who registered in September and voted in November for Mr. Evans were struck off the lists in January, 1911. The record abounds with testimony showing an intense and all-pervading interest in a state-wide prohibition proposition voted on in November and likely to bring out a full registry and vote. At that election there were over 2000 more votes polled than were cast for Governor in 1908 and the registration shows nearly 17,000 more names. For

contestant it is argued, as we grasp it, that the striking off of those negro voters so shortly after the November election harks back and impugns the validity of their votes in the November election—all this, observe, without direct evidence that any bogus or illegal negro votes were cast, any colonization schemes laid or hatched, or any direct evidence of fraud. As our commissioner declined to follow the lead of that argument, so do we.

This because:

The controlling maxims are: All things are presumed to be legitimately done, until it is proved to the contrary; all things are presumed to be done solemnly. [Chlanda v. Transit Co., 213 Mo. 1. c. 261; Coke, Litt. 6. b.] What ought to be done is easily presumed. Those maxims evidence a rule of convenient public policy universally applied and without which great distress would spring in the affairs of men. They abide until facts proved to the contrary make them take flight. They apply with peculiar force to official acts. [Hartwell v. Parks, 240 Mo. 537.]

The full force of those maxims is due here. By them the election officers, the judges and clerks, are presumed to have done their duty in the registration for the general election in 1910 in registering voters. They are presumed to have done their duty in sifting and purging the lists before that election. They are presumed to have done their duty at the election itself in receiving votes. Subsequently when preparatory to a new election they purged the lists, the same presumption arises. If these officers in January purged these lists, not with a view to a new election nor under the commands of the statute, but because of wrongs they were conscious had been committed in the former registration and thus their last act was but setting in judgment on their former act, a situation would arise different

than exists which would call for disposition in the light of all the facts. Moreover, when a voter has voted and his vote has been counted the presumption in the first instance is he was a legal voter. [Gumm v. Hubbard, 97 Mo. l. c. 320.] That presumption was allowed in that case in favor of the foreign born—*a fortiori* does not apply in favor of the native born as here; for we shall assume the historical fact that the present negro is native and to the manner born. All this but means that the official acts of duly appointed officers, charged with a duty in that regard, are presumed to be correct and he who asserts they are incorrect and attacks their validity holds the laboring oar and has the burden of proof. That burden contestant did not successfully carry in this instance.

We ought not to leave the subject without pointing out that the vote of a voter is not impugned by the mere fact that his name is stricken from a precinct list on a recanvass after an election. He may have moved (and negroes are shown to be prone to do that often in St. Louis), he may have died in the interim. So, the recanvassing officers may have inadvertently missed him. So, he may not get his verification notice when mailed. So, if he did get it, he may not care to take the time or go to the bother of reregistering. Through interest or the lack of it the registration of voters notoriously swells and ebbs at spells. All these elements, and more, would have to be sharply reckoned with before it could be held as a matter of law that striking a voter from the lists impugns his vote cast in an election held two months before the fact. In this case contestee, not resting alone on friendly presumptions, took up the cudgels and went on and put in proof tending to explain the striking off of a great many of those negroes in a way to take the edge from the insistence that they were not *bona fide* voters. [*Vide,* our commissioner's report: "Con-

testants also introduced evidence showing that many of these colored voters were registered from lodging, rooming, or boarding houses; the number registered from each of said houses ranging from 1 to 19. Contestants also introduced two witnesses who testified that they visited a row of houses on Clark avenue from which some of these colored voters were registered and were unable to find the parties as shown on the registration books. On the other hand, a large number of witnesses were introduced by contestees, most of them negroes, who testified as to the identity of a large number of the negroes so registered."]

That they registered from a congested negro quarter as appears from the testimony avails nothing to the point. The negro race is not only markedly sociable and gregarious, but courts, assuming not to be more ignorant than the rest of mankind but to know what every one else knows, will take judicial notice that imperious prevailing social conditions irresistibly drive negroes to herd together. As to them the saying of old Robert Burton is brought to pass, viz., "'Birds of a feather gather together." [Anat. Mel. E. Claxton's Ed., p. 429.] That some of the houses from which some of them registered were "lodging, rooming or boarding houses," as found by our commissioner, or are disreputable, as argued by contestant, avails nothing to the point in and of itself. If the fact is as argued it is regrettable. But may we try an election contest on the cynical adage: Give a dog a bad name, and then—hang him. Exconvicts, unpardoned, may be disfranchised, but up to this time technical or actual sexual morality is not made a statutory test of a voter by the Missouri lawmaker. When that day comes, if ever, there will be fine grinding in the mill, but no matter about that. As the law now stands we do not understand it would avail

contestant aught to show that all or any of those negroes were ethically incorrect.

The point is ruled against contestant.

III. *Of the votes of certain aliens, and herein of scratched votes.*

(a). It is contended by contestant that certain foreign born citizens, voting at that election for contestee, were either naturalized by some court without jurisdiction, or had voted on first papers too old, or the registration books contained information showing they were not entitled to vote for this, that or the other reason. Under the facts of this record to analyze contentions made under this head and determine them would be utterly vain and futile. This, because: Contestee, as a counterstroke, raises the same issues on about the same number of foreign voters, who cast their votes for contestant. Our commissioner patiently collated and classified the facts relating to such votes on both sides and set down the number of votes affected in each class by itself with peculiar facts relied on to vitiate the vote. Of course, as was proper, in order to make his classifications fit for comparison one with the other he used the same classification in votes challenged by both contestant and contestee. Contestant does not put his finger on any appreciable error or looseness in the commissioner's classification or in the number of votes said to be affected under each group, but adopts the plan of making a different classification on his side than he does on his opponent's. Why is somewhat dark. As to that we say: There is not enough of substance in the difference between the plan of the commissioner and that of contestant to justify bothering with determining which is the better of the two for the ends in view in both. Summed up, the gist of the matter is this: Under either plan, if the one or the other claim of contestant were allowed, only to be offset (as

would be bound to happen on the facts here) by a similar claim by contestee, it would profit neither party a whit. It would not at all affect the net result and merit; *ergo,* the questions are somewhat moot in nature and may be laid on the shelf to be decided in some future case riding off on them.

(b). The testimony shows that here and there, *sporadically,* in all the precincts in St. Louis, Mr. Gass's name was struck off of some Democratic ballots by a single stroke of a pencil and no name written in. The same testimony shows a like condition on Republican ballots where Mr. Evans's name was scratched similarly. The same condition exists in companion cases, only to a greater extent. A sinister conclusion is drawn from those scratches by learned counsel, *arguendo,* and if it be allowed as just, then, Mr. Evans's plurality of 2000 or so over Mr. Gass is reduced by a very few votes.

In this view of it the question might be ruled as in paragraph "a" under this head. But we allow ourselves these further observations. If blocks of ballots or consecutive ballots, to a number challenging attention, were marked by a scratch of this sort, or if it were shown that the same pencil was used in the scratches, or that the phenomenon occurred largely with one set of election officers, or in one precinct (when the vote was on a State officer), or if there were any other indications pointing to a motive or to a common or preconceived design to commit the wrong of an unauthorized erasure, it would be well worth looking into. But where, as here, there are no facts of that sort, but the scratches occur sporadically and scattered throughout the entire city, affecting both parties alike, we can allow no sinister significance to them.

Counsel argue at our bar that a voter, intending to scratch a name and write in no other, would naturally not use only a single stroke of a pencil, but would

obliterate the name by several scratches amounting to a *smear*. That contention we can not allow as sound, because: A court would be on dangerous ground that would undertake to answer that question in favor of or against a single pencil stroke or lay down a rule for scratching by *a priori* reasoning. Could the very Solomon himself know how liberally a voter would use a pencil in scratching a name from a ballot, absent evidence on habit, temperament, time, condition of mind, taste and sourroundings, as here? We trow not. Not knowing, to that lack of knowledge a beatitude or admonition applies—found, I think, in Theophrastus Such (I quote offhand from memory and may corrupt the text): Blessed is he who knowing nothing avoids giving wordy evidence of the fact. A very celebrated judge once upon a time gave me that rule as a good one in judicial discourse.

To illustrate: There has been now and then an ingenious conceit indulged in damage suits that appellate courts should know judicially how a woman would fall and light under given circumstances in a street car accident, or where her center of gravity would be. Those amusing speculations on natural philosophy have been gently put to one side as beyond the purview of the doctrine of judicial notice. [Flaherty v. Transit Co., 207 Mo. l. c. 326-7; *vide,* remarks of GARY, J., in Chicago Ry. Co. v. Yancey, 33 Ill. App. 94.] The matter being no little related to the question up, we apply the same rule.

The point is not allowed to contestant.

IV. *Of the failure to write "yes" or "no" in the column headed: "Qualified Voter."*

The registration books in use in St. Louis have a column headed "Qualified Voter." The scheme of registration involves two registers, one kept by one clerk and one by another and both are originals. Our commissioner reported, *inter alia,* as follows:

"Frequently one of the books, in the column under the caption, 'Qualified Voter,' contains entries on every line, such as 'Yes,' or some mark indicating 'Yes,' while the same column in the other, or duplicate book, will be blank throughout. · It is shown that there are 29,427 names on the registration books as to whom there is no entry in the columns under the caption 'Qualified Voter.' "

As we read the testimony those names were got at by counting from only one set of the duplicate books. But that is immaterial, in view of what follows. At the threshold of the subject lies this large and guiding proposition, which should never be lost sight of from end to end of the discussion, namely: If by error or accident at the outset a name is written on the books, which, in the further course of the registration investigation it turns out is not that of a voter, that name should be erased *instanter* and got rid of once for all. Such is the law and such was the practice as shown by the testimony.

Mindful of that, as presently seen, it is not contended by contestant's counsel that a failure to fill out that column, or to write "yes" when by the facts disclosed by the registration "no" belonged there, or "no" when by the same facts "yes" should have been written, would kill a cast ballot on a recount. To illustrate: A citizen about to register gives in his residence, name, nativity, color, age in years, occupation and date of application to be registered. The facts so given in are written down in columns with appropriate heading (*vide*, R. S. 1909, secs. 6198 and 6199) and those facts show him to be native born, of full age and a resident of his precinct in St. Louis for the required time to gain a residence, and yet the clerk, without striking off the name, writes "no" in the column headed "Qualified Voter," despite the patent fact that all the facts following the name in all the columns point only one way, viz., that he was qualified, or (as

in this instance) writes nothing at all when he should have said "yes." The last hypothesis states a typical case easily put and covering the point. As to that supposed case we say: It has been often said by way of a generalization that the right to vote is not a natural or vested right. That phraseology will generally be found to be used by courts in connection with a direct or implied consideration of the bald power of the lawmaker to regulate the right of suffrage within constitutional bounds. Under that power minors, paupers, soldiers, idiots, prisoners (and—may we not say it softly—our mothers, sisters, wives and sweethearts) are denied the right to vote in this State. But that generality is never used by courts to belittle or whittle away a right so tender, so sacred and so deep-going as the right of manhood suffrage under a democratic form of government among Anglo-Saxon peoples. To sensibly regulate the right is permitted; to turn a cold eye upon it, is unjudicial; to deny it *in toto,* is unthinkable—is stark *revolution.*

So, there is much learning and controversy in the courts on the question whether this or that voting or registering regulation is mandatory or only directory. It would serve no useful purpose to be drawn into that wide field of discussion under this head. It is not in this case under this head and should not be lugged in; for no one would have the hardihood to say, until the lawmaker writes it down in terms open to no other construction, that a court should hold that a mere clerk, who through inadvertence or misapprehension, wrote "no" in that column when the facts before him called out for "yes," or "yes" when he should have written "no," or nothing when he should have written something, would thereby either enfranchise an illegal voter, or disfranchise an honest one, destroying his ballot on a recount when once cast and counted by election judges. That would be a drastic holding at one unhappy and unreasoned push opening a new

and wider door to possible fraud than any ever shut
by this court; for if we once held that by a mere *slip*
a clerk could on one hand destroy or on the other
grant so valuable a right, we would open the door to
*design* following in its train and after that—"the
deluge," as the French king put it in a similar pre-
dicament.

We do counsel for contestant simple justice by
saying that although they make something of the fact
that in one set of registration books nearly 30,000
names have no entry opposite in that column, yet they
do not contend that lapse, in and of itself, vitiates
the vote of registered and honest voters. Such would
be a two-edged sword cutting to the bone both ways
in this case. Their object in introducing that line of
testimony (as is shown in the commissioner's hearing
and by the train of their brief) is indicated by an ex-
cerpt from the record stating their position, thus: "I
must state," said contestant's counsel, "that the pur-
pose of this is not to disqualify any voter but to show
the manner in which the election officers discharged
their duty. . . . The evidence is not offered for the
purpose of disqualifying the individual whose name
appears, but for the purpose of showing the manner
in which the election officers conducted or transacted
the business the law imposed upon them, and it is only
for that purpose."

It will thus be seen that the contention is in the
nature of a prelude or by way of inducement leading
up to the ultimate and vital issue of an actual wrong
and fraud edging its way into the ballot box by slip-
shod registration; and to be told, if at all, in the story
of the ballots themselves when compared critically
with the lists, examined front and back and held in
judgment in this contest, together with the qualifica-
tion of any challenged voter—a matter heretofore
ruled against contestant on the facts in a former par-
agraph. The word "yes" or the word "no" might

serve a useful purpose to catch the eye of election judges on election day to pass one vote or halt another, which, on summary investigation may be found an illegal one, but which, in the presence of a legal vote, ought not to control.

We have no call at this time to discuss the legal significance of the certificate made by the election officers to the registration books as required by statute. [R. S. 1909, sec. 6209.] Nor the significance of the statutory phrase, "under the column 'date of application,' the month, day and year when the applicant presented himself *and was adjudged a qualified voter in the election precinct."* [R. S. 1909, sec. 6198.] Nor to further consider the prima facie presumption, heretofore mentioned (Gumm v. Hubbard, supra), of validity arising from the fact that the named person voted and his vote as cast was counted. We pass those matters by and dispose of the question in hand by referring to the stated position of contestant's counsel and by calling attention to the record fact that no voter opposite whose name the column was unfilled was shown to be an illegal one, though the case was open to such proof; and the further fact that the testimony does not show or attempt to show how many of the 30,000 voters voted for Mr. Gass or for Mr. Evans, hence the case could not break on the point were it held vital. (And that, as shown, we do not do.) Wherefore, the point, if point it is, is ruled against contestant.

V. *Of the initials of judges on some ballots.*

There is a question lodged here relating to certain ballots cast by registered voters and whose right to vote is not impugned, viz., the absence of the initials of judges on a few ballots. The question is: Should they be counted or rejected? Its determination one way or the other does not affect the result, but it ought to be decided because of the unfortunate state our decisions are in. This court is in duty

bound, at this its first opportunity, to set itself right on that score and speak a single and authoritative voice instead of a double one, as it now does. In McKay v. Minner, 154 Mo. 609, decided February 20, 1900, Division Two held that ballots bearing the name or initials of only one election judge though cast could not be counted in a contest. To reach that result that division in set terms overruled Bowers v. Smith, 111 Mo. 45—a celebrated and carefully considered case in Banc whose reasoning·confessedly led to an opposite result. Our brethren deciding the McKay case dissented in the Bowers case and the McKay case made their dissent effectual. On March 14, 1900, Division One in Hehl v. Guion, 155 Mo. 76, followed the Bowers case in holding *contra*. Doubtless if the two divisions had been aware of these diverse decisions, the case would have been sent to Banc to be settled there, as was seemly and in accord with precedent; but those opinions were handed down, the court adjourned for the term and the matter has remained in that unsatisfactory condition to this hour. The whole question hinges, as stated in the Bowers case, on whether the law itself declares a specified irregularity to be fatal to the ballot. If so, courts enforce it; if not, they will not be astute to create a fatal irregularity by judicial construction. As pointed out in Hehl v. Guion, in the Bowers case it was ruled that: ''If the law itself declares a specified irregularity to be fatal, the courts will follow that command irrespective of their views of the importance of the requirement. . . . In the absence of such declaration, the judiciary endeavor as best they may to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is held to vitiate the entire return; otherwise it is considered immaterial.''

The benign, hence just, doctrine thus announced was followed by Division One. The reasoning of VALLIANT, J., in the Hehl case is unanswerable. His interpretation of the statutes, following BARCLAY, J., in the Bowers case, is so broad, so wise and so close as to leave nothing more to be said. During a consideration of the question from the standpoint of statutory law, precedent and natural justice, he quoted from a Canadian case pointing the dangers lurking in any other view. "It must also be borne in mind," says BLAKE, V. C., in the case borrowed from (Grant v. McCallum, 12 Can. L. J. N. S. l. c. 114), "that if the court lightly interferes with elections on account of errors of the officers employed in their conduct, a very large power may thus be placed in the hands of these men. That which arises from carelessness today may be from a corrupt motive tomorrow, and thus the officer is enabled, by some trivial act or omission, to serve some sinister purpose, and to have an election avoided, and at the same time to run but little chance of the fraudulent intent being proved against him." That excerpt aptly states the sum of the matter in a nutshell.

The question was up in the 45th General Assembly in the contest over the Lieutenant-Governorship between Mr. Painter and Mr. Gmelich, where in a report presumably prepared by Senator McDavid, a sound and veteran lawyer, and unanimously concurred in by his learned associates on the committee, the doctrine of Hehl v. Guion was applied by the committee and accepted by the General Assembly in deciding that contest. [House Journal, 45th General Assembly, p. 31, et seq.]

We reaffirm and stand by the doctrine of the Bowers and Hehl cases and overrule the McKay case. In doing so we are not to be taken as palliating or justifying a slovenly performance of official duty. There are remedies open and ample for non-performance of or misfeasance in official duties. So, if their official

acts open a way for fraud and wrong to corrupt an election, it may be followed and corrected in a contest. We are protecting an honest voter, who, doing no wrong himself, performs his own duty as a citizen, casts an honest vote and is entitled to have it counted unless the law itself raises an impassable obstacle, as held in the Bowers and Hehl cases.

Other questions are alluded to in briefs, but none of them are material, and we have already pursued the matter far.

From the views thus expressed, there can be but one just result announced, viz., that Mr. Evans is entitled to the office of Superintendent of Public Schools. Judgment for him is, therefore, now rendered. *Valliant, C. J.,* and *Graves* and *Ferriss, JJ.,* concur; *Woodson, J.,* in separate opinion; *Kennish* and *Brown, JJ.,* not sitting.

## CONCURRING OPINION.

WOODSON, J.—I fully concur in the result reached in this case, and to all that is said in the opinion, except I believe that the statutes prescribing the duties of the Board of Election Commissioners of the city of St. Louis, regarding the registration of electors, is mandatory, as regards the qualified voters of that city.

The whole registration of the city is clearly placed under their supervision and control. [R. S. 1909, art. 15.]

They are thereby expressly empowered to investigate, hear evidence and to strike from the registration books all names improperly placed thereon by the precinct registrars, and to add thereto names of qualified voters whose names were improperly omitted or erased therefrom by the precinct registrars, as well as those authorized to be placed upon the registration books by the courts, etc.

Section 6191, clauses 3, 4, 5, 6, 7 and 8 thereof, which read as follows:

"3rd. Separate printed lists, by precincts, showing names of qualified voters, alphabetically arranged, as they appear on the registry books; giving name, number of line in registry books and residence of such voter, at the time such registry books are delivered to the election commissioners by the precinct registrars at the close of registration.

"4th. Similar separate printed supplementary lists, by precincts, of names added as qualified voters to the registry books by precinct registrars.

"5th. Also similar supplementary lists, by precincts, of names erased from the registry books by precinct registrars.

"6th. Also similar printed supplemental lists, by precincts, of voters added, restored or erased by the board of election commissioners.

"7th. Also similar printed supplemental lists, by precincts, of voters added or restored by the court.

"8th. Also similar printed supplemental lists, by precincts, or voters added by the election commissioners or the courts, and whose names do not appear on the regular registration lists."

The board, by this section, is given express authority to pass upon and adjudicate whether or not a person is, or is not, a qualified voter, and that section of the statute in express terms provides that the board shall state the "names of qualified voters," as well as the facts upon which that finding is predicated.

If the registration books show that a party is in fact a qualified voter, but the board through error or fraud should find to the contrary, the courts entertain ample power, by the mandamus or other appropriate original writ, to compel it to so state that fact or its judgment.

While the finding of the board, that a person was a qualified voter, might not be controlling, and doubt-

less would not be, in a contested election case, if the fact should appear that he was not in fact, a qualified voter; but the object and purpose of the statute in requiring the Board of Election Commissioners to state the fact that he is a "qualified voter," is to control the various judges and clerks of election, on the day of election, in passing upon the question, as to whether or not the persons who offer themselves as voters, are qualified voters. If that fact is not stated, then one set of judges and clerks in one precinct might hold that one person was a qualified voter, and those of another, upon the same showing, might hold to the contrary, and vice versa. In other words, in my opinion, the judges and clerks, in those cities where the law provides for a registration of electors, have no authority whatever, to pass upon the qualifications of the voters, except perhaps in cases where their attention is called to some fact which shows the voter has been disqualified from voting since the board passed upon his qualification.

*Valliant, C. J.,* concurs herein.